UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

SHELBEN T. CURTIS,

      Petitioner,

          v.                   CAUSE NO. 3:22-CV-509-MGG

WARDEN,

      Respondent.

## OPINION AND ORDER

Shelben T. Curtis, a prisoner without a lawyer, filed a habeas corpus petition challenging his convictions for voluntary manslaughter and aggravated battery under Case No. 45G04-1203-FA-7. Following a jury trial, on August 1, 2014, the Lake County Superior Court sentenced him to fifty years of incarceration.

## FACTUAL BACKGROUND

In deciding this habeas petition, the court must presume the facts set forth by the state courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Indiana Court of Appeals summarized the evidence presented at trial:

> Theodore Roe attended Calumet High School, and during his senior year the school determined that he needed to be placed in the guidance office because he was harassed by and afraid of Shelton, who was Curtis's son, and James Love. After he graduated, Roe was attacked by Shelton and sustained injuries which included part of his ear being cut off, and Roe and his father reported the incident to police.
>
> On one day in late July 2011, Roe picked up his girlfriend Maranda Cuevas, his sister Cassandra, and Cassandra's boyfriend Cameron

Jimerson from a hotel and drove to a residence near 46th Avenue and Roosevelt Street to drop off Jimerson. After dropping him off, Roe drove Cassandra and Cuevas to a D-Mart gas station about two minutes away. As Roe was pumping gasoline, Shelton and Love pulled into the DMart lot in a black vehicle and "kind of circle[d] the gas station." Shelton and Love stared "[e]villy" at Roe and those with him and gave them "dirty looks." Roe entered his vehicle and "took off." Cassandra observed that Shelton and Love had exited their vehicle and had walked toward the gas pump used by Roe. As Roe drove away, Cuevas noticed that Shelton and Love "were kind of gesturing like as if they wanted to fight or just—not very nice." Shelton and Love returned to their vehicle, pulled out of the DMart lot, and drove in the same direction as Roe. Cassandra called Jimerson, and someone called Roe's father, who called the police.

Roe drove back to 46th Avenue and Roosevelt Street, and Jimerson entered the vehicle. Roe drove a short distance, and the black vehicle driven by Shelton reappeared behind his vehicle "out of nowhere." Roe eventually stopped his vehicle, and Jimerson exited it so that he could attempt to speak with Shelton. Jimerson told the others to stay in the car, and he walked slowly towards Shelton's vehicle with his hands up. Shelton started screaming profanities, stated that he was going to kill Jimerson, made a "gun gesture" towards Jimerson and Roe, and then sped away.

Jimerson entered Roe's vehicle, and Roe drove back to 46th Avenue and Roosevelt Street. As Jimerson was stepping out of the vehicle, the vehicle previously driven by Shelton turned the corner and drove towards Roe's vehicle. Shelton, Curtis, Love, and Curtis's daughter Shaquita exited the vehicle, and Jimerson and Roe exited Roe's vehicle.

Curtis started to run towards Jimerson, and Shelton and Love began to run towards Roe. Jimerson raised his hands and asked what was going on and "what's the problem with these kids." Curtis continued to approach Jimerson with his fists up and said "you want to bang, let's bang." Curtis "gave [Shelton] a little nudge," and Shelton stepped forward and started to strike Roe. Shelton and Love punched and pushed Roe. Shaquita struck Cuevas and Cassandra. Jimerson stepped in front of Shaquita with his arms out to back her away, and Curtis joined Shelton and Love in striking Roe. Jimerson then ran towards Curtis, placed his arms out, and tackled him with his forearm, and they fell to the ground.

As soon as Curtis and Jimerson hit the ground, Curtis reached behind his back and pulled out a .40 caliber semiautomatic pistol. Jimerson attempted

to grab Curtis's arm to keep him from pointing the gun at him. As they struggled, Curtis was able to pull back the slide and cock the gun. Jimerson began to stand up, pushed Curtis, and attempted to turn away. While Jimerson was within a few feet, Curtis shot Jimerson in the back, and Jimerson felt his legs stop working and fell to the ground. Roe had backed away across the street. Curtis then crossed the street moving towards Roe, Cassandra, and Cuevas. Curtis fired his pistol at Roe's chest, and Roe threw his hands on his chest, stumbled, and fell down in the grass. Curtis went toward his vehicle and said to the others with him "come on. Come on. Let's go." Before Curtis and the others entered their vehicle, police swarmed the intersection. Roe died at the scene, and Jimerson was permanently paralyzed from the waist down.

\* \* \*

In March 2012, Curtis was indicted on Count I, voluntary manslaughter for killing Roe, a class A felony; and Count II, aggravated battery for inflicting injury on Jimerson that caused protracted loss of impairment of the function of a bodily member, a class B felony. A jury trial was held on June 23, 25, 26, and 30, 2014.

\* \* \*

The jury found Curtis guilty on both counts.

*Curtis v. State*, 35 N.E.3d 318 (Ind. App. 2015); ECF 9-6 at 2-4.

In the habeas petition, Curtis argues that he is entitled to habeas relief because the trial court erred by admitting a video of the prior confrontation at the gas station and allowing testimony regarding encounters between his son and Theodore Roe during high school. He contends that this evidence was irrelevant, and, even if it had sufficient relevance to be admissible, the probative value was outweighed by the prejudicial effect. He also argues that trial counsel erred by failing to file a motion to dismiss the indictment; by failing to object to the jury instruction listing sudden heat as

an element of voluntary manslaughter; and by failing to object to the jury instruction

listing serious permanent disfigurement as an element of aggravated battery.

<u>STANDARD OF REVIEW</u>

"Federal habeas review . . . exists as a guard against extreme malfunctions in the

state criminal justice systems, not a substitute for ordinary error correction through

appeal." *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (quotations and citation omitted).

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d).

> [This] standard is intentionally difficult to meet. We have explained that
> clearly established Federal law for purposes of §2254(d)(1) includes only
> the holdings, as opposed to the dicta, of this Court's decisions. And an
> unreasonable application of those holdings must be objectively
> unreasonable, not merely wrong; even clear error will not suffice. To
> satisfy this high bar, a habeas petitioner is required to show that the state
> court's ruling on the claim being presented in federal court was so lacking
> in justification that there was an error well understood and
> comprehended in existing law beyond any possibility for fairminded
> disagreement.

*Woods,* 135 S. Ct. at 1376 (quotation marks and citations omitted). Criminal defendants

are entitled to a fair trial but not a perfect one. *Rose v. Clark*, 478 U.S. 570, 579 (1986). To

warrant relief, a state court's decision must be more than incorrect or erroneous; it must

be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "A state court's

determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation marks omitted).

<u>DISCUSSION</u>

<u>Trial Court Error -- Evidentiary Ruling</u>

Curtis argues that he is entitled to habeas relief because the trial court erred by admitting a video showing an altercation between Curtis's son and Theodore Roe at the gas station the day Roe was killed. He argues that this evidence, as well as testimony regarding incidents of bullying in high school, were irrelevant and unduly prejudicial. "To be of constitutional import, an erroneous evidentiary ruling must be so prejudicial that it compromises the petitioner's due process right to a fundamentally fair trial." *Howard v. O'Sullivan*, 185 F.3d 721, 723–24 (7th Cir. 1999). "This means that the error must have produced a significant likelihood that an innocent person has been convicted." *Id.* at 724. "Indeed, because of this high standard, evidentiary questions are generally not subject to review in habeas corpus proceedings." *Id.*

Under Indiana law, "evidence is relevant if it has any tendence to make a fact more or less probable than it would be without the evidence; and the fact is of consequence to determining the action." Ind. R. Evid. 401. Further, under Indiana law, "the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Ind. R. Evid. 403.

At trial, Curtis conceded that he shot Roe and Jimerson but asserted self-defense as an affirmative defense to the charges of voluntary manslaughter and aggravated battery. ECF 11-8 at 7. Under Indiana law, "a person is justified in using reasonable force against any other person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force." Ind. Code § 35-41-3-2 (c). However, "a person is not justified in using force if: (1) the person is committing or is escaping after the commission of a crime; (2) the person provokes unlawful action by another person with intent to cause bodily injury to the other person; or (3) the person has entered into combat with another person or is the initial aggressor unless the person withdraws from the encounter and communicates to the other person the intent to do so and the other person nevertheless continues or threatens to continue unlawful action." "In order to prevail on a claim of self-defense a defendant must show: (1) he was in a place where he had a right to be; (2) he acted without fault; and (3) he had a reasonable fear of death or great bodily harm." *Coleman v. State*, 946 N.E.2d 1160, 1165 (Ind. 2011).

Before trial, trial counsel filed a motion in limine stating that the prosecution should not be permitted to introduce evidence of the confrontation outside the gas station between Curtis's son and Roe. ECF 11-6 at 78-79. Trial counsel argued that Curtis was not present during the encounter; the jury would be misled into thinking the shooting was a continuation of the prior altercation; and the risk of misleading the jury or confusing the issue outweighed the benefit of providing context. *Id.*; ECF 11-8 at 4-5. According to Curtis, his son returned home from the gas station and told him about the

altercation. ECF 11-8 at 4. However, it was not until Curtis received a call informing him of a fight about to take place that he drove to the scene. *Id.* The prosecution countered that evidence of the gas station incident was necessary to provide background, as well as to show that Curtis was "instigating and provoking this confrontation," and therefore did not act in self-defense when he shot Theodore Roe and Cameron Jimerson. *Id.* at 11. The trial court denied the motion, determining that the incident at the gas station put the conduct underlying the criminal charges in context. *Id.* at 16.

At trial, multiple witnesses testified about instances of bullying between Roe and Curtis's son during high school. The prosecution presented Roe's father, who testified that his son was beat up multiple times, including an incident where "half of his ear was cut off." The father responded by submitting a police report and giving his son an ax handle to keep in the car to defend himself. *Id.* at 72. On cross examination, Roe's father testified that he had written "Equalizer" on the ax handle and wrapped one end with duct tape to provide a hand grip.[1] *Id.* at 76. Lieutenant John Gruszka testified that on July 25, 2011, Roe and his father reported a battery. *Id.* at 81. Trial counsel objected to hearsay and relevance. *Id.* The prosecution argued that the testimony would establish that Roe kept an ax handle because he feared for his life; trial counsel countered that it did not matter why Roe had a weapon, only that he had one. *Id.* at 84-85. To address

---

[1] The ax handle admitted into evidence is inscribed with "The Equilizer." State's Ex. 4. Curtis's briefing, as well as the trial transcript, consistently use "Equalizer." For the sake of consistency, the court will use Curtis's spelling.

trial counsel's concerns of unfair prejudice, the trial court provided the following

limiting instruction:

> So as I read the Indictment to you, the defendant is charged with an offense on July 29th of 2011. There is background information being talked about approximately a month or so prior to that event. Mr. Shelben Curtis is not involved or alleged to have been involved in that incident a month prior to July 29th with the son, Shelton Curtis. You are not to infer any knowledge upon the defendant having — this defendant knowing about these scuffles, fights, school nights, that kind of thing, all right?

*Id.* at 91.

During its direct examination of Roe's sister, the prosecution moved to admit the

footage from the gas station. *Id.* at 230-31. Trial counsel objected and was overruled. *Id.*

at 231. The prosecution introduced evidence that Curtis ran toward the victims,

initiated the altercation, and shot Jimerson while he was attempting to turn away. *Id.* at

167-75; ECF 11-9 at 154-66. Though Jimerson testified that Roe was unarmed, another

witness testified that he was holding the ax handle when he was killed. *Id.* at 347, 417.

Both witnesses agreed that Roe had backed away across the street before he was shot.

*Id.*

As mentioned above, the federal habeas standard for State evidentiary errors also

requires the court to consider the evidentiary ruling within the context of the full trial

record. At trial, the prosecution presented the individuals who had accompanied Roe

on the night of the incident as witnesses. Cassandra Roe, the victim's sister, testified

that, on July 29, 2011, Roe drove her and Maranda Cuevas, his girlfriend, to a gas

station in his white Honda. ECF 11-8 at 219-50; ECF 11-9 at 2-48. She noticed a black

Avalanche driven by Curtis' son pull in with James Love riding passenger. *Id.* They cast

dirty looks towards her as they drove, and Roe drove away from the gas station. *Id.*
Cassandra called her boyfriend, Cameron Jimerson. *Id.* They picked him up, and he sat
in the front passenger seat of the Honda. *Id.* Shortly thereafter, they again encountered
the black Avalanche with Curtis' son and Love. *Id.* Jimerson exited the Honda and
asked Curtis' son and Love if they had a problem, and they responded with gun
gestures directed at Roe and Jimerson. *Id.* Roe and Jimerson returned to the Honda, and
Roe dropped Cameron off. *Id.*

According to Cassandra, as they drove away, they saw Curtis' son and Love in a
blue Chevy truck. *Id.* They then encountered a silver Ford truck. *Id.* Justin and Michael
Smith jumped out of the truck and angrily approached the Honda. *Id.* Roe maneuvered
away from the Smiths and went to pick Jimerson back up. *Id.* When they arrived at
Jimerson's location, the black Avalanche pulled up with Curtis and his daughter, and
Curtis' son and Love pulled up in the blue Chevrolet truck. *Id.* Curtis approached Roe
and Jimerson along with his children and Love. *Id.*

Cassandra further testified that, as Jimerson and Curtis began speaking, Curtis'
son and Love began to fight with Roe, who had no weapon, and Cassandra told Roe to
defend himself and to beat them up. *Id.* In a separate location, Curtis and Jimerson also
began fighting, but she did not see who struck first. *Id.* Cassandra tried to get out of the
vehicle, but Curtis' daughter closed the door and punched her in the ear. *Id.* As
Jimerson came over to help her, Curtis, his son, and Love were beating Roe on the
ground. *Id.* Jimerson knocked over Roe's attackers. *Id.* When Jimerson and Roe stood
back up, Curtis had a gun in his hand and pointed it at them. *Id.* At this time, neither

Roe nor Jimerson had weapons. *Id.* Jimerson tried to knock the gun out of Curtis' hand, but Curtis shot the gun four times. *Id.* She saw Roe and Jimerson stumble and fall. *Id.*

Maranda Cuevas testified that Curtis' son and Love gestured as if they wanted to fight at the gas station as Roe drove away. ECF 11-9 at 71-137. She testified that, when they encountered Curtis' son and Love the second time, they screamed at those in the Honda and asked them if they wanted to fight. *Id.* At the scene of the shooting, she saw Curtis, his son, his daughter, and Love get out of their vehicles. *Id.* Roe and Jimerson exited the Honda with no weapons. *Id.* The parties exchanged words, and, in response, Curtis said, "If you want to fight, let's fight," and gave his son a nudge. *Id.* The son took a step forward and started to hit Roe. *Id.* When she went to help Roe, Curtis' daughter hit her head, and Cuevas ran back to Cassandra, who sat in the Honda. *Id.* She saw Curtis hitting Roe on the head with a gun within a "cluster of people." *Id.* She grabbed the ax handle from the Honda to scare the attackers off, but Curtis' son tackled her and wrested it away from her. *Id.* He then ran to Roe and hit him with the ax handle. *Id.* Roe had the ax handle in his hands after he was shot and stumbled away, and he dropped it before he fell. *Id.* She got in the Honda, and Cassandra drove it down the road. *Id.*

Jimerson testified that Roe had just dropped him off for work when he received a frantic call from Cassandra about the gas station encounter. *Id.* at 138-215. After Roe picked him back up, a black Avalanche with Curtis' son and another individual pursued them. *Id.* Jimerson asked Roe to stop so that he could try to negotiate a resolution. *Id.* When Jimerson got out of the Honda and approached the Avalanche,

Curtis' son screamed profanity, threatened to kill Jimerson, and sped off. *Id.* He

assumed that the immediate threat had passed and was dropped off again for work. *Id.*

Jimerson further testified that the black Avalanche returned, and three black men

and one black woman exited the vehicle. *Id.* He also saw a silver Ford truck with two

white men, but they left without exiting their vehicle. *Id.* The black men ran towards

Jimerson and Roe, who had gotten out of the Honda. *Id.* When Jimerson attempted to

negotiate with the older man, the older man approached him with his fists up and said,

"You want to bang, let's bang." *Id.* The younger black men began to attack Roe. *Id.*

Cuevas exited the Honda, and the black woman attacked her. *Id.* When Cassandra

moved to the driver seat, the black woman attacked her instead. *Id.* As Jimerson

separated the black woman from Cassandra, the older man had joined the younger men

in attacking Roe. *Id.* Jimerson responded by tackling the older man, and the entire

group of men fell down. *Id.* On the ground, the older man pulled out a gun. *Id.* At this

time, neither Jimerson nor Roe had a weapon. *Id.* Jimerson grabbed the older man's arm

to prevent him from aiming the gun at him, and the older man tried to cock the gun.

Jimerson and the older man tried to stand up at the same time. *Id.* Jimerson tried to

push the older man away and turned away himself. *Id.* As Jimerson turned, he felt the

bullet enter his back, and he fell. *Id.* He saw Roe stumble and fall on the grass on the

opposite side of the road. *Id.* As Roe lay face down on the ground, the young men

continued to attack him. *Id.*

Curtis did not testify at trial, but the prosecution presented his grand jury

testimony at trial. State Trial Ex. 68. At the grand jury proceeding, Curtis testified that,

11

on the morning of July 29, 2011, he was at his home with his daughter. *Id.* He sent his son and Love to the gas station in his black Avalanche to pick up energy drinks. *Id.* Fifteen minutes later, they returned and reported that, at the gas station, some people threw a can at the Avalanche and that they threatened them and shook pipes at them. *Id.* His son and Love left in a blue truck. *Id.* Forty minutes later, his neighbor Justin Smith called him and said, "Your son is on the street, and they about to jump on him with some pipes. Two girls and a guy." *Id.* He went to the scene in his Avalanche and instructed his daughter to accompany him. *Id.* Jimerson approached the vehicle and said, "Man, we the two oldest out here, we can talk about this." *Id.* Curtis agreed but noticed Roe and his son exchanging words and that Roe had reached down and pulled a concealed metal pipe from his pants. *Id.* Roe immediately hit Curtis' son with a full swing to the head, and Curtis ran to assist his son. *Id.* Roe hit his son's head again, and Jimerson came from behind and attacked Curtis. *Id.* He fell on his back, twisted his left knee, and pulled his gun. *Id.* He saw Roe running at him with a pipe raised over his head, and he shot him. *Id.* Jimerson came at Curtis and reached down towards him, and Curtis shot him too. *Id.*

At the grand jury proceeding, Curtis explained his misidentification of the ax handle as a pipe as follows:

**Prosecution:** Let me show you now what has been admitted as Grand Jury Exhibit Number 22. Did you ever see this before?

**Curtis:** That looks like what he had. Looks like it.

**Prosecution:** Is that the pipe you are talking about that he had with him just before you shot him?

**Curtis:** Yes, it looks like it. It looks like it. Looks like it.

**Prosecution:** That looks like it?

**Curtis:** Yeah.

**Prosecution:** Now, that's not a pipe, is it?

**Curtis:** No. Looks like more like a handle for something of some sort.

**Prosecution:** But it's obviously not colored anywhere like a piece of pipe. It's not steel, it's not metal. It's not shaped like a pipe.

**Curtis:** Well, I'm going to have to beg to differ.

**Prosecution:** Now, is this what you saw Mr. Roe pull out of his pants?

**Curtis:** That's what it looked like. That's exactly what it looked like.

*Id.* at 48. Consistent with Curtis' testimony, trial counsel focused on Roe's use of the ax handle to justify the shootings as an act of self-defense at opening and closing. ECF 11-8 at 47-55; ECF 11-10 at 159-78.

Several disinterested eyewitnesses also testified at trial. An individual who resided nearby testified that she did not see the entire incident but saw black individuals running up the street, two black men fighting near her fenced yard, and heard two gunshots. ECF 11-8 at 106-18. After one black man was shot, she saw him lying on the fence as a light-headed girl checked on him. *Id.* Her neighbor testified that he heard two gunshots and saw a white car fly down the street and turn into dead end. *Id.* at 118-33. He went outside and saw Curtis' son with an unidentified object in his hand standing over Roe. *Id.* A bystander in a vehicle stopped at the intersection testified that he saw the fight in progress and heard two gunshots. *Id.* at 134-49. He saw a white

male involved in the fight holding his stomach with both hands, saying "He shot me," and fell in the grass after crossing the road. *Id.* He saw a black male helplessly laying across the fence and another black male, whom he described as twenty to thirty-years old and skinny, beating him in the head. *Id.* He saw a white car leave the scene. *Id.* Another resident testified that she saw a black male in a red shirt pacing in the road as a white Honda drove up and down the road. *Id.* at 158-82. As the individuals in the white Honda were speaking to the black male, a black Avalanche arrived. *Id.* Two white males got out from the white Honda, but the resident did not see any weapons in their hands. *Id.* Two black males got out from the black Avalanche, one with red shorts, no shirt, and an afro and the other who was taller, slimmer, with a black t-shirt and jeans. *Id.* A tall, thin female also got out from the black Avalanche. *Id.* The black males exchanged words with the white males, ran over to them, and began posturing for a fistfight. *Id.* The resident saw the black males throw the first punch. *Id.* As she went to call 911, she heard two gunshots. *Id.*

Officer Corle testified that he was the first police officer to arrive on the scene. *Id.* at 182-218. He spoke with Curtis and his son, neither of whom appeared to be injured, complained of pain or injury, or asked for medical attention at the scene. *Id.* However, the son complained of back pain as Officer Corle transported him to the police station. *Id.* Dr. Young Kim testified that he performed the autopsy on Roe. ECF 11-9 at 56-71. He found that Roe measured five feet, ten inches, and one hundred forty pounds. *Id.* He also found abrasions on the forehead, the nose, the elbow, and the leg. *Id.* Detective Tomko testified that, when he arrived on the scene, he found the ax handle on the

ground next to Roe's body. *Id.* at 221-46. The ax handle measured twenty-eight inches. ECF 11-10 at 55. Photographs revealed that, on the day of the incident, Roe wore red shorts that rested below the knee. State's Trial Ex. 25.

Detective Minchuk testified that, in the aftermath of the incident, Curtis did not appear to have cuts, blood, or bruising, but he walked with a limp. ECF 11-10 at 83-118. Curtis' son also did not appear to have cuts, scrapes, bruises, broken skin, or any injuries that suggested that he had been hit by a pipe. *Id.* Medical staff examined Curtis' son when he complained of back pain and head pain but did not shave his head, use stitches, bandages, or ice, or transport him to another location for further treatment. *Id.* In the recording of the gas station encounter, it did not appear that any objects were thrown at the black Avalanche or that occupants of the white Honda had weapons. *Id.* No weapons, other than the ax handle and the gun, were found at the scene. *Id.*

On direct appeal, Curtis argued that the trial court erred in allowing the testimony regarding the altercation at the gas station. ECF 9-3 at 14-15. Specifically, he maintained that it was misleading because it depicted the shooting as a continuation of the altercation at the gas station. *Id.* He maintained that the testimony was irrelevant because the prosecution did not show that Curtis was aware of the events at the gas station beyond what his son had told him. *Id.* He further maintained that the evidence was unduly prejudicial because it "urged the jury to believe that Mr. Curtis somehow played a part in or condoned [his son's] mischief." *Id.* The Indiana Court of Appeals rejected the claim, finding that the testimony regarding the events leading up to the shootings provided context and helped explain Curtis's involvement in the altercation.

ECF 9-6 at 10. Additionally, it "helped set forth the escalating conduct of the various participants and Curtis in the altercations." *Id.*

Regarding Curtis's argument that the State improperly focused on unrelated incidents of bullying, the Indiana Court of Appeals noted that the trial court instructed the jury not to infer that Curtis had any knowledge of those prior incidents. *Id.* at 11. The appellate court also determined that the testimony about bullying "helped explain Curtis's relationship with Shelton, Roe, and Jimerson as well as any motive he may have had to harm Roe and Jimerson." *Id.* Finally, the testimony related to his claim of self-defense, addressing whether Curtis incited the confrontation, acted as the initial aggressor, or used excessive force. *Id.*

After reviewing the record, this court cannot conclude that the State court's evidentiary rulings constituted an error so prejudicial that it compromised Curtis's due process right to a fair trial. *See Howard*, 185 F.3d at 723-24. First, the court does not perceive any evidentiary error. As noted by the Indiana Court of Appeals, the video footage and testimony regarding the earlier altercation at the gas station provided necessary context because they helped explain the events leading up to Curtis's involvement in the altercation. Similarly, the testimony regarding prior incidents of bullying between Curtis's son and Roe was relevant to show Curtis's motive and his relationship to the parties involved. When the victim's father and Lieutenant Gruszka testified about the bullying, they relayed only what was necessary to establish background for the altercation. The prosecution elicited this testimony to counter Curtis's claim of self-defense; it was relevant to determining whether Curtis had reason

16

to incite the violence or choose not to withdraw from the encounter. The State's focus on the prior bullying was necessary to explain why Roe possessed an ax handle inscribed with "Equalizer," evidence that Curtis used to justify his claim of self-defense. ECF 11-8 at 76; ECF 11-10 at 168, 175-76. To prevent the jury from inferring that Curtis had knowledge of the prior bullying, the trial court issued a limiting instruction. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions.").

Further, the prosecution presented substantial independent evidence to defeat Curtis's claim of self-defense. Specifically, Jimerson and Cuevas testified that Curtis arrived at the scene with his son and Love, who had been pursuing Roe and his companions. They testified that he exited the vehicle with the two young men, and charged toward them with his fists up and challenging them to a fight. They testified that Curtis joined the fray by assisting his son and Love with their two-on-one assault on an unarmed Roe, and Cuevas further testified that Curtis nudged his son into assaulting Roe. Bystander eyewitnesses confirmed key portions of their accounts, including testimony that Curtis and those accompanying him charged towards Roe and Jimerson with their fists up.

By contrast, there were numerous unexplained inconsistencies with Curtis' grand jury testimony. For example, Curtis testified that his son told him that, at the gas station Roe, Cassandra, and Cuevas threw a can at the Avalanche, threatened him, and shook pipes at him. He also testified that his neighbor told him that two girls and a guy with pipes were about to attack his son. But the video recording of the gas station contradicted the son's purported account, and no other evidence suggested any use of

pipes or ax handles before Curtis arrived at the scene. To the contrary, the record demonstrated that, when law enforcement, who arrived on the scene immediately after the shooting, searched the scene for weapons, they found only the ax handle belonging to Roe and the gun used by Curtis. It is possible that Curtis' son and neighbor might have misled Curtis, but the record contained no evidence to corroborate that the son or the neighbor made such statements and did not suggest any motive they might have had to mislead Curtis in this manner. Further, while Curtis' misidentification of the ax handle as a pipe is somewhat understandable, it seems unusual that the son or the neighbor would have made the same misidentification unless their statements had been coordinated or fabricated in some manner. Additionally, it is unclear how Roe, who was not particularly tall, could have concealed a twenty-eight inch ax handle in the red shorts he wore on the day of his death. Moreover, Curtis testified that he saw Roe take two swings at his son's head, but no evidence in the record suggested that the son suffered injuries consistent with such an attack. In fact, there was no evidence of an injury to Curtis' son.

In sum, the record contains substantial evidence identifying Curtis as the instigator of the confrontation. The evidence to the contrary consists solely of Curtis' testimony, which contains inconsistencies that are difficult to reconcile with the impartial testimony and the investigative evidence. Consequently, even if such evidence was admitted in error, the court cannot find that such error "produced a significant likelihood that an innocent person has been convicted." *Howard v. O'Sullivan*,

18

185 F.3d 721, 723–24 (7th Cir. 1999). Therefore, Curtis's claim that the trial court made an erroneous evidentiary ruling is not a basis for habeas relief.

Ineffective Assistance of Counsel – Voluntary Manslaughter Indictment and Instruction

Curtis argues that he is entitled to habeas relief because trial counsel failed to move to dismiss the voluntary manslaughter charge. According to Curtis, the indictment was defective because it improperly charged sudden heat as an element of voluntary manslaughter. Similarly, Curtis argues that trial counsel was ineffective because he failed to object to the final jury instructions, which listed sudden heat as an element of voluntary manslaughter.

To prevail on an ineffective assistance of counsel claim in State court, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91.

The test for prejudice is whether there was a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been

different." *Id.* at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Id.* at 693. In assessing prejudice under *Strickland* "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). However, "[o]n habeas review, [the] inquiry is now whether the state court unreasonably applied *Strickland*." *McNary v. Lemke*, 708 F.3d 905, 914 (7th Cir. 2013). "Given this high standard, even 'egregious' failures of counsel do not always warrant relief." *Id.*

At the post-conviction stage, Curtis argued that by charging sudden heat as an element of voluntary manslaughter in the indictment, "the State shifted the burden of proof upon" him. ECF 9-12 at 12. The Indiana Court of Appeals rejected this argument, holding that the indictment did not specify whether sudden heat was an element or a mitigating factor. ECF 9-15 at 8-10. Count I of the indictment stated:

> [O]n or about July 29, 2011, in the County of Lake, State of Indiana SHELBEN TERRELL CURTIS did knowingly or intentionally, kill Theodore J. Roe while acting under sudden heat and by means of a handgun, a deadly weapon, contrary to I.C. 35-42-1-3, and against the peace and dignity of the State of Indiana.

*Id.* According to the appellate court, the indictment merely "track[ed] the language of subsection 3(a) of the voluntary manslaughter statute." *Id.* At the time, that subsection read:

> (a) A person who knowingly or intentionally:
>
>> (1) kills another human being . . .
>
> while acting under sudden heat commits voluntary manslaughter, a Class B felony. However, the offense is a Class A felony if it is committed by means of a deadly weapon.

> (b) The existence of sudden heat is a mitigating factor that reduces what otherwise would be murder . . .  to voluntary manslaughter.

Ind. Code § 35-42-1-3 (1997). Because the indictment did not specify whether sudden heat was an element or a mitigating factor, the Indiana Court of Appeals determined that Curtis's trial counsel was not ineffective for failing to move to dismiss Count I of the indictment. *Id.*

Regarding Curtis's claim that the jury instructions improperly included sudden heat as an element of voluntary manslaughter, the Indiana Court of Appeals agreed that that the jury instructions were erroneous. *Id.* at 11-14. However, the appellate court did not conclude that failure to object to this improper instruction constituted ineffective assistance of counsel. *Id.* As the court explained, it was not clear at the time of the trial whether sudden heat was an element of the crime when the prosecution brought a free-standing voluntary manslaughter charge. *Id.* Though the Indiana Supreme Court later clarified that sudden heat is a mitigating factor rather than an element of the offense, it did so four years after Curtis's trial in *Brantley v. State*, 91 N.E.3d 566 (Ind. 2018). *Id.* The Indiana Court of Appeals thus concluded that "trial counsel [could not] be faulted for failing to predict the course our Supreme Court would eventually take in *Brantley*." *Id.* Furthermore, the appellate court noted that trial counsel could have chosen not to object as a matter of strategy, reasonably deciding that "requiring the State to prove the existence of sudden heat beyond a reasonable doubt bolstered his claim of self-defense." *Id.* at n.4.

21

The Indiana Court of Appeals also determined that trial counsel's failure to object did not prejudice Curtis. *Id.* The jury instructions, though improperly listing an additional element, still specified that "the State must have proved each of the following elements beyond a reasonable doubt." *Id.* The erroneous instruction therefore "*increased* the burden on the State; it did not shift the burden to Curtis." *Id.* Having concluded that trial counsel's performance was neither deficient nor prejudicial, the Indiana Court of Appeals rejected Curtis's ineffective assistance of trial counsel claim regarding the jury instruction. *Id.*

After reviewing the record, the court cannot find that the State court made an unreasonable determination on these claims. As to trial counsel's failure to move to dismiss the indictment, the State court reasonably determined that trial counsel did not perform deficiently by failing to move to dismiss the indictment based on their finding that the voluntary manslaughter charge was not defective. Further, Curtis offers no explanation as to how a defective charge could have prejudiced him at trial.

As to trial counsel's failure to object to the erroneous jury instructions, the Indiana Court of Appeals reasonably determined that this failure did not constitute deficient performance. As noted by the appellate court, it was unclear at the time of the trial whether sudden heat was a mitigating factor or an element of the offense when the prosecution charged a criminal defendant with a freestanding count of voluntary manslaughter. Because the law was unclear at the time, effective representation did not require trial counsel to object to the jury instruction. *See Kirklin v. United States*, 883 F.3d 993, 997 (7th Cir. 2018) ("We have said repeatedly that the guarantee of effective

assistance of counsel does not require an attorney to anticipate every eventual change in the law.").

Additionally, the State court was not unreasonable in determining that Curtis was not prejudiced by trial counsel's failure to object to the erroneous jury instruction. The jury instruction clearly articulated that the burden was on the prosecution to prove each element of the offense. Though sudden heat was improperly included as one of the elements of voluntary manslaughter, such inclusion only added to the prosecution's burden; it required the prosecution to prove an additional element beyond a reasonable doubt instead of merely introducing some evidence of sudden heat. Curtis broadly asserts that the indictment and the jury instruction caused him prejudice, but he does not specifically describe how the additional element affected his trial and pretrial strategies or how it otherwise harmed his defense. Therefore, Curtis's claims of ineffective assistance of counsel regarding the voluntary manslaughter indictment and jury instruction are not a basis for habeas relief.

<u>Ineffective Assistance of Counsel – Aggravated Battery Instruction</u>

Curtis argues that he is entitled to habeas relief because trial counsel failed to object to the jury instruction listing serious permanent disfigurement as an element of aggravated battery when that element was not charged in the indictment. In the indictment, the aggravated battery charge alleged that Curtis "knowingly or intentionally inflict[ed] injury on Cameron Jimerson that caused protracted loss of impairment of the function of a bodily member or organ." ECF 11-6 at 72. The jury instruction on the elements of aggravated battery, however, included an additional

component, stating that the prosecution's burden required them to prove that Curtis inflicted an injury "that caused serious permanent disfigurement or protracted loss or impairment of the function of a bodily member or organ." *Id.* at 106.

At the post-conviction stage, Curtis argued that by including serious permanent disfigurement, this instruction "improperly instructed the jury that Curtis could be convicted of an element with which he was not indicted." ECF 9-12 at 27. Accordingly, Curtis argued that trial counsel's failure to object to the instruction may have resulted in the jury finding him guilty of causing serious permanent disfigurement, an offense not charged in the indictment. *Id.*

The Indiana Court of Appeals rejected this claim, reasoning that, "[w]hen a defendant claims that trial counsel was ineffective for failing to object," the standard is whether the trial court would have been required to sustain that objection had it been made. ECF 9-15 at 14-18. The appellate court agreed that trial counsel may have been ineffective for failing to object to the jury instruction, because if he had objected, "the trial court should have sustained the objection." *Id.* However, the appellate court concluded that Curtis was not prejudiced by this error. *Id.* First, the appellate court reasoned that "the trial court's preliminary and final instructions expressly reiterated the language of Count II of the indictment, which made no reference to serious permanent disfigurement and only charged him with causing protracted loss or impairment of the function of a bodily member or organ."[2] *Id.* Additionally, the

_____

[2] The Indiana Court of Appeals is correct that the preliminary instructions, as well as Final Instruction No. 1, reiterated the language of the indictment and made no mention of permanent

prosecution made no argument that Curtis caused permanent disfigurement, nor did it make any reference to disfigurement or present any evidence to that effect. *Id.* The appellate court thus concluded that, although the jury instruction exceeded the scope of the crime charged, this did not have a prejudicial effect, because "there was no evidence in the record to support the uncharged portions of the crime." *Id.*

After reviewing the record, the court cannot find that the State court made an unreasonable determination on this claim. Though the final jury instruction defining aggravated battery included permanent disfigurement, the prosecution did not present any evidence or argument to support that charge. As the State court noted, no evidence was presented to support a finding of permanent disfigurement; the prosecution did not reference disfigurement during opening or closing arguments; and the preliminary instructions read to the jury reiterated the language of the indictment without referencing the uncharged portions of the crime. ECF 11-6 at 81, 83; ECF 11-8 at 25. Jimerson, the aggravated battery victim, testified regarding his paralysis, but he did not mention disfigurement. ECF 11-8 at 428-31. By contrast, the evidence that Curtis "inflicted injury on Cameron Jimerson that caused protracted loss of impairment of the function of a bodily member or organ" was undisputed at trial. While it is conceivable that the jury convicted Curtis pursuant to the erroneous language, Curtis has not demonstrated a substantial likelihood that that the jury did so. *See Harrington v. Richter*,

---

disfigurement. ECF 11-6 at 81, 103. However, Final Instruction No. 4 did include permanent disfigurement in its definition of aggravated battery. *Id.* at 106.

562 U.S. 86, 112 (2011). Therefore, the claim of ineffective assistance of counsel regarding the aggravated battery jury instruction is not a basis for habeas relief.

<u>CERTIFICATE OF APPEALABILITY</u>

Pursuant to Section 2254 Habeas Corpus Rule 11, the court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that a reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons explained in this order, there is no basis for encouraging Curtis to proceed further.

For these reasons, the court DENIES the amended habeas corpus petition (ECF 20-1); DENIES a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and DIRECTS the clerk to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED on this 12th day of April.

s/ Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge